UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

C. L. KING & ASSOCIATES, INC.,

               Plaintiff,

      -v-                              1:18-CV-833

SALISBURY BANK AND
TRUST COMPANY,

               Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

| APPEARANCES: | OF COUNSEL: |
|---|---|
| SEYFARTH, SHAW LAW FIRM<br>Attorneys for Plaintiff<br>620 Eighth Avenue<br>New York, NY 10018 | EDWARD M. FOX, ESQ.<br>OWEN R. WOLFE, ESQ. |
| HINCKLEY, ALLEN LAW FIRM<br>Attorneys for Defendant<br>30 South Pearl Street, Suite 901<br>Albany, NY 12207 | CHRISTOPHER V. FENLON, ESQ. |
| BECKER, GLYNN LLP<br>Special Litigation Counsel for the Trustee<br>299 Park Avenue<br>New York, NY 10171 | ALEC P. OSTROW, ESQ. |

DAVID N. HURD
United States District Judge

## MEMORANDUM–DECISION and ORDER

## I. INTRODUCTION

On June 12, 2018, plaintiff C.L. King & Associates, Inc. ("C.L. King" or "plaintiff"), a

New York-based brokerage, filed this action in Supreme Court, Albany County, against

defendant Salisbury Bank and Trust Company ("Salisbury" or "defendant"), a

Connecticut-based bank, in an effort to partially satisfy a $13 million money judgment it holds against a former client, William F. Nicklin ("Nicklin").

At issue is $500,000 Nicklin shelled out to pay off a bank loan shortly before he went bankrupt. C.L. King contends this was not an ordinary, arm's length transaction between Nicklin and his lender but rather a preference payment made to placate one of Nicklin's own business clients at plaintiff's expense. According to plaintiff, Nicklin's transfer therefore amounts to a type of fraudulent conveyance made avoidable by creditors under various provisions of the Uniform Fraudulent Conveyance Act ("UFCA").

As C.L. King explains, Ira Effron ("Effron"), a co-founder and the former chairman of the board of directors at Riverside Bank ("Riverside"), initially hired NSB Advisors, LLC ("NSB Advisors"), Nicklin's investment advisory firm, to handle certain employee retirement investment accounts controlled by Effron in his capacity as president of his family's business.

Thereafter, Nicklin employed risky trading strategies in both his personal accounts and in the investment accounts he managed for clients like Effron. For Nicklin's personal account, the high-risk scheme involved borrowing substantial sums of money on credit from plaintiff to make big bets on the stock market. According to plaintiff, Nicklin managed to rack up over $40,000,000 in losses in his personal account in just a few short months.

Nicklin's failed investment strategies hit his clients' accounts hard, too. So, facing a demand from C.L. King that he immediately deposit the roughly $13 million necessary to bring his own personal brokerage account out of the red, Nicklin opted instead to use his remaining liquidity to try to keep his own business clients happy.

As relevant here, C.L. King alleges that Nicklin repaid the $500,000 bank loan from Riverside a full six months early and, in exchange, Effron agreed to keep his family's

substantial business accounts invested with Nicklin's advisory firm. Riverside merged into Salisbury in 2014, making the successor entity the target of this clawback suit.

On July 13, 2018, Salisbury removed this action to federal court and then moved under Federal Rule of Civil Procedure ("Rule") 12(b)(6) to dismiss C.L. King's complaint in its entirety. After plaintiff amended its complaint as of right, defendant renewed its motion to dismiss, which was fully briefed in early December of 2018.

On June 6, 2019, with the motion to dismiss pending, C.L. King filed a letter alerting the Court to the fact that Nicklin had recently filed for chapter 7 bankruptcy relief. This action was then stayed for a period of ninety days to allow time for Daniel J. Ventricelli, the chapter 7 bankruptcy trustee (the "Trustee"), to investigate the claims asserted by plaintiff in this action and decide whether and how to proceed with this suit.

On September 17, 2019, the parties jointly advised that the Trustee has chosen to substitute for C.L. King as plaintiff in this action and that Salisbury has consented to the change in the named plaintiff. The parties also requested that the Court lift the stay and rule on defendant's pending motion to dismiss, which has been fully briefed and will be decided without oral argument.

## II. BACKGROUND

The following facts are taken from C. L. King's amended complaint, Dkt. No. 9, and are assumed true for the purpose of resolving Salisbury's motion to dismiss.

From 2004 through May 2009, Nicklin worked as a registered advisor at Brown Advisory Holdings, Inc., an investment management firm. Am. Compl. ¶ 36. Over those years, Nicklin cultivated an investment advising relationship with Effron, who exercised

control over two employee pension plans maintained by EFCO Products, Inc. ("EFCO Products"), the Effron family's business. Id. ¶¶ 32-35, 37.

Beginning in 2009, Nicklin opened his own personal stock trading account with C.L. King, a brokerage firm in Albany, New York. Am. Compl. ¶¶ 2, 7-10. As part of that business relationship, plaintiff advanced to Nicklin "margin credit," which is a kind of loan secured by the value of securities in a client's account.[1] *See id*. ¶¶ 8-9, 13-14.

Then, in March of that year, Nicklin left his job at Brown Advisory Holdings, Inc. and started NSB Advisors, his own investment advising firm. Am. Compl. ¶¶ 38-39. Effron followed Nicklin, moving his personal accounts and the EFCO Products pension plan accounts over to NSB Advisors. *Id*. ¶¶ 40-41. Effron, acting as trustee to the pension plans, granted Nicklin, acting as principal for NSB Advisors, control over investment decisions for those accounts. *Id*. ¶¶ 11, 35, 42-47.

Shortly after NSB Advisors opened for business in early 2009, Riverside, with Effron sitting as chairman of the bank's board of directors, extended to Nicklin one or more business loans to help him get his own shop started. Am. Compl. ¶¶ 29-31, 48. In January of 2010, Riverside refinanced Nicklin's various debts into one consolidated loan for $3,050,000 (the "Riverside loan"). *Id*. ¶ 49. According to C.L. King, Nicklin used the Riverside loan to fund his advisory business as well as his other securities trading activities. *Id*. ¶¶ 51-53.

Notably, Nicklin secured the Riverside loan by initially pledging the value of his personal brokerage account at C.L. King (the "Pledged Account") and 2,000 shares of stock

---

[1] Sophisticated and/or foolhardy stock traders like Nicklin typically use margin credit to leverage the purchasing power of their existing investments. *See* Am. Compl. ¶ 9. The terms of these loans are governed by agreements between the client and the brokerage, by federal rules and regulations, and by the securities exchanges on which these trades occur. *See id*. ¶¶ 13-14.

in PMFG, Inc. ("PMFG"). Am. Compl ¶ 54. However, in August of 2010 Riverside released the Pledged Account, leaving only the stock in PMFG as collateral for the loan.[2] *Id*. ¶ 58. PMFG is or was some kind of investment vehicle used by other clients of NSB Advisors, including the EFCO pension plans, Nicklin's wife and family, and even Nicklin's dentist. *Id*. ¶¶ 55-56.

Between December 2011 and April of 2012, Nicklin's margin-heavy trading strategy blew up in his face. Am. Compl. ¶¶ 8-9, 12. By April, Nicklin had lost over $40,000,000 in his personal account at C.L. King. *Id*. According to plaintiff's complaint, Nicklin's investment decisions also caused the loss of substantial sums of money in his clients' trading accounts, including Effron's personal account and the accounts for the two EFCO pension plans. *Id*. ¶ 60.

Because the value of his personal trading account had fallen below a certain required minimum value, C.L. King and regulatory entities like the New York Stock Exchange ("NYSE") sent to Nicklin a series of letters warning him that the remainder of his trading account would be forfeited if he did not immediately replenish its value with new cash or other securities by a date certain. Am. Compl. ¶¶ 15-17.

Nicklin, knowing he could not satisfy these "margin calls" from C.L. King or the NYSE, never deposited any more money in his personal trading account. Am. Compl. ¶¶ 17, 19. Instead, by letter dated May 7, 2012, Nicklin advised all of his clients, including Effron, that

---

[2] Plaintiff alleges this was an unusual business decision, and one a disinterested lender would not have made. According to plaintiff, the outstanding Riverside loan represented a substantial portion of the bank's entire book of business. *See* Am. Compl. ¶ 50.

he was in a bit of personal financial trouble and that his own personal trading account would probably be liquidated soon. *Id*. ¶ 61.

On May 15 and 16, 2012, C.L. King made good on its threats, liquidating Nicklin's personal account and recovering all but $13,097,946.12 of the margin losses Nicklin owed to plaintiff (the "Margin Claim Amount"). Am. Compl. ¶¶ 20-22. Thereafter, plaintiff continued to demand immediate repayment of the Margin Claim Amount. *Id*. ¶ 22. Nicklin ignored those demands, instead setting out to shelter his remaining assets from creditors (such as plaintiff) and to salvage his business contacts (such as Effron). *See id*. ¶¶ 22, 24, 63-107.

In late May of 2012, Nicklin allegedly disclosed to Effron that he owed C.L. King $13 million. Am. Compl. ¶ 62. Two weeks later, Nicklin instructed a representative at Riverside, where he still held a personal checking account, to deduct $500,000 to pay off the outstanding balance on the Riverside loan, which was not due for another six months. *Id*. ¶¶ 59, 63-66.

According to C.L. King, this early repayment of the Riverside loan occurred as part of an arrangement to keep Effron happy and to ensure that the two pension plans he controlled stayed with NSB Advisors. Am. Compl. ¶¶ 67-68. Plaintiff supports this accusation by pointing to certain suspect provisions of a revised investment agreement that NSB Advisors and EFCO Products executed shortly after Nicklin repaid the Riverside loan. *Id*. ¶¶ 70-82.

On August 9, 2012, C.L. King sought to recover the $13 million Margin Claim Amount by filing an arbitration proceeding against Nicklin before the Financial Industry Regulatory Authority ("FINRA"). Am. Compl. ¶ 23. According to plaintiff, Effron stepped down as chair of Riverside the very same day. *Id*. ¶ 31. Two years later, in December of 2014, Riverside merged into Salisbury.

C.L. King alleges that Nicklin drew out the FINRA arbitration proceeding for as long as possible in an effort to avoid repayment. Am. Compl. ¶ 24. Plaintiff further alleges that Nicklin used this extra time to execute another sophisticated financial strategy, only this time the goal was to shield Nicklin's remaining assets from creditors and to evade his repayment obligation to plaintiff. *See id*. ¶¶ 90-107 (detailing Nicklin's convoluted attempts to hide assets by, *inter alia*, creating a series of revocable trusts and taking out substantial loans against certain life insurance policies he owned).

On November 26, 2016, a three-member arbitration panel finally awarded C.L. King damages in the amount of $13,097,946.12 plus interest. Am. Compl. ¶ 25. Immediately thereafter, plaintiff sought and received confirmation of the arbitral award in a special proceeding in Supreme Court, New York County. *Id*. ¶¶ 26-28. NSB Advisors has since filed bankruptcy. *Id*. ¶ 86.

## III. LEGAL STANDARD

"To survive a Rule 12(b)(6) motion to dismiss, the '[f]actual allegations must be enough to raise a right to relief above the speculative level.'" *Ginsburg v. City of Ithaca*, 839 F. Supp. 2d 537, 540 (N.D.N.Y. 2012) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). "Dismissal is appropriate only where plaintiff has failed to provide some basis for the allegations that support the elements of his claims." *Id*.

"When ruling on a motion to dismiss, the court must accept as true all of the factual allegations contained in the complaint and draw all reasonable inferences in the non-movant's favor." *Faiaz v. Colgate Univ.*, 64 F. Supp. 3d 336, 344 (N.D.N.Y. 2014) (Baxter, M.J.). In making this determination, a court generally confines itself to the "facts stated on the face of the complaint, . . . documents appended to the complaint or

incorporated in the complaint by reference, and . . . matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

## IV. **DISCUSSION**

C.L. King's amended complaint offers three alternative theories under which Nicklin's early repayment of the $500,000 Riverside loan amounts to a fraudulent conveyance made avoidable by creditors under the UFCA. *See* N.Y. DEBT. & CRED. LAW §§ 270-81.[3]

In Count One, C.L. King alleges Nicklin made the conveyance without fair consideration, and that doing so rendered him insolvent in violation of Debtor & Creditor Law ("DCL") § 273; in Count Two, plaintiff alleges Nicklin made the conveyance without fair consideration, and that doing so left him with an unreasonably small amount of business capital in violation of DCL § 274; and in Count Three, plaintiff alleges Nicklin made the conveyance with actual intent to defraud in violation of DCL § 276.

Salisbury contends dismissal of all three claims is warranted. According to defendant, Counts One and Two must be dismissed because Nicklin *did* receive fair consideration for the transfer—he paid off a perfectly valid, pre-existing debt owed to Riverside. As for Count Three, defendant argues it too must be dismissed because plaintiff has failed to plead Nicklin's fraudulent intent with sufficient particularity.

Further, Salisbury argues that even assuming C.L. King has plausibly alleged a claim under one or more of these three theories, defendant lacked knowledge of any impropriety and is thus an innocent transferee shielded from liability by DCL § 278. Finally, defendant contends plaintiff's suit is an improper attempt to gain priority over other creditors who might

---

[3] The parties are here on diversity jurisdiction, 28 U.S.C. § 1332(a)(1), and assert that New York law applies to this dispute. The Court agrees.

have valid claims against Nicklin. According to defendant, DCL § 151 actually provides it with a "right of setoff" that is superior to plaintiff's money judgment against Nicklin.

C.L. King responds that a creditor–transferee like Salisbury that accepts payment for a debt is not necessarily insulated from liability for a debtor's fraudulent conveyance. Plaintiff argues that the amended complaint alleges more than merely the simple repayment of a pre-existing debt; instead, plaintiff claims it has pleaded an insider relationship between Nicklin and Effron, who at the time chaired the Riverside board of directors.

Relatedly, C.L. King argues that DCL § 278 does not shield a transferee where, as here, the presence of an insider relationship plausibly suggests that bad faith is attributable to both parties to the transaction. Finally, plaintiff claims that Salisbury's argument about a setoff right is a red herring. According to plaintiff, DCL § 151's setoff right is inapplicable to the facts of this case because the money was long gone from Nicklin's Riverside checking account at the time plaintiff filed this action.

Salisbury replies that while C.L. King may have alleged bad faith attributable to Nicklin as transferor, it has failed to plausibly allege bad faith attributable to defendant as transferee and therefore the DCL §§ 273 and 274 claims in Count One and Two must still be dismissed. Defendant further replies that plaintiff has failed to satisfactorily plead facts establishing Nicklin's fraudulent intent and therefore the DCL § 276 claim in Count Three must still be dismissed.

### A. New York's Debtor & Creditor Law

Enacted in a modern form by the New York Legislature in 1925, the UFCA provides a mechanism for creditors to challenge as fraudulent certain conveyances made by a debtor. *See Capital Distribs. Servs., Ltd. v. Ducor Express Airlines, Inc.*, 440 F. Supp. 2d

195, 203 (E.D.N.Y. 2006); *see also Eberhard v. Marcu*, 530 F.3d 122, 130 (2d Cir. 2008) (tracing historical origins and eventual codification of New York law governing the avoidance of fraudulent conveyances).[4]

As relevant here, DCL §§ 273 and 274 provide remedies for "constructive fraud," which is premised on a lack of fair consideration, while § 276 provides a remedy for "actual fraud," which turns on issues of intent. *See Long Oil Heat, Inc. v. Spencer*, 375 F. Supp. 3d 175, 195 (N.D.N.Y. 2019) (Sannes, J.). Under any of these three theories, a creditor able to demonstrate the fraudulent nature of a conveyance may have the offending transfer "set aside . . . to the extent necessary to satisfy his claim." § 278(1)(a).

### 1. Constructive Fraud

Salisbury contends that C.L. King's claims for constructive fraud under DCL §§ 273 and 274 must be dismissed because plaintiff has failed to plausibly allege that Nicklin did not receive "fair consideration" for the transfer. Def.'s Mem., Dkt. No. 13-1, 10.[5]

As Salisbury explains, Nicklin's $500,000 payment satisfied the outstanding balance on a valid, existing loan that Riverside advanced to Nicklin some time before the events giving rise to this lawsuit occurred. Def.'s Mem. at 10. In defendant's view, the fact that Nicklin repaid an existing debt precludes any inference of bad faith attributable to defendant *qua* transferee, a shortcoming defendant argues is fatal to both of the constructive fraud claims. *Id*. at 13-15.

---

[4] Under the DCL, the term "conveyance" is defined broadly to include "every payment of money, assignment, release, transfer, lease, mortgage, or pledge of tangible or intangible property, and also the creation of any lien or encumbrance." N.Y. DEBT. & CRED. LAW § 270.

[5] Pagination corresponds to CM/ECF.

C.L. King responds that this is a misstatement of New York law. Pl.'s Mem., Dkt. No. 17, 19. According to plaintiff, "fair consideration" is not present unless both the transferor *and* the transferee acted in good faith. *Id*. at 21-22. And plaintiff insists it has adequately alleged that good faith was lacking as to both parties to this transaction—plaintiff alleges, on the one hand, a wide-ranging scheme by Nicklin to defraud plaintiff and other creditors, and on the other, an insider relationship between Nicklin and Effron at a time when Effron exercised significant control over Riverside's banking activities. *Id*. at 22.

Under both DCL §§ 273 and 274, a conveyance made without "fair consideration" is considered fraudulent as to creditors "without regard to [a debtor's] actual intent." *See* N.Y. DEBT. & CRED. LAW § 273 (requiring contested transaction be made "by a person who is or will be thereby rendered insolvent"); § 274 (requiring contested transaction leave the business debtor with "unreasonably small capital").

For purposes of § 273, a related provision of the DCL explains that a person is considered "insolvent" when "the present fair salable value of his assets is less than the amount that will be required to pay his probable liability on his existing debts as they become absolute and matured." N.Y. DEBT. & CRED. LAW § 271(1).

And for purposes of § 274, courts have explained that a business debtor is left with "unreasonably small capital" when he is in a financial condition just short of "equitable insolvency." *MFS/Sun Life Tr.–High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F. Supp. 913, 944 (S.D.N.Y. 1995) (adopting Third Circuit's construction of the UFCA).

Under either of these constructive fraud provisions, the common thread running through both is the concept of "fair consideration," which is present "[w]hen in exchange for such property, . . . as a fair equivalent therefor, and in good faith, property is conveyed or an

- 11 -

antecedent debt is satisfied." N.Y. DEBT. & CRED. LAW § 272. In other words, "DCL § 272 defines fair consideration to comprise two elements—good faith and the payment of a fair equivalent value for the property interest conveyed." *Chen v. New Trend Apparel, Inc.*, 8 F. Supp. 3d 406, 447 (S.D.N.Y. 2014).

As relevant here, "New York courts have stressed that the 'good faith of both transferor and transferee is . . . an indispensable condition in the definition of fair consideration' under DCL § 272." *Long Oil Heat, Inc.*, 375 F. Supp. 3d at 197 (quoting *Stout St. Fund I, L.P. v. Halifax Grp., LLC*, 48 N.Y.S.3d 438, 443 (N.Y. App. Div. 2d Dep't 2017)).

In turn, either party's "good faith" is a concept understood to mean "without either actual or constructive knowledge of any fraudulent scheme." *HBE Leasing Corp. v. Frank*, 48 F.3d 623, 636 (2d Cir. 1995). For instance, "[g]ood faith may be deemed lacking if there is no 'honest belief in the propriety of the activities in question,' or if there is 'knowledge of the fact that the activities in question will hinder, delay, or defraud others.'" *Chen*, 8 F. Supp. 3d at 448 (quoting *S. Indus., Inc. v. Jeremias*, 411 N.Y.S.2d 945, 949 (N.Y. App. Div. 2d Dep't 1978)).

Upon review of the allegations in C.L. King's amended complaint in light of the governing law set forth above, Salisbury's motion to dismiss these claims will be denied. As a general matter, "[t]he burden of proving both insolvency and the lack of fair consideration is upon the party challenging the conveyance[.]" *See, e.g.*, *Am. Inv. Bank, N.A. v. Marine Midland Bank, N.A.*, 595 N.Y.S.2d 537, 538 (N.Y. App. Div. 2d Dep't 1993).

But if those issues sound like fact-bound inquiries ill-suited to disposition at the pleadings stage, it is because they usually are. *Am. Inv. Bank, N.A.*, 595 N.Y.S.2d at

538 ("[T]he determination of insolvency or what constitutes fair consideration is generally one of fact to be determined under the circumstances of the particular case.").[6]

For present purposes, then, C.L. King has plausibly alleged Nicklin's insolvency under DCL § 273. *See, e.g.*, Am. Compl. ¶¶ 17, 19, 110-11. Plaintiff has also plausibly alleged that the repayment left his business undercapitalized under DCL § 274. *See, e.g.*, *id*. ¶¶ 22, 24, 62-107, 115-17.

Salisbury, citing *Sharp Int'l Corp. v. State St. Bank & Tr. Co.*, 403 F.3d 43, 53 (2d Cir. 2005) ("*Sharp*"), nevertheless contends that a transfer that satisfies a pre-existing debt is not avoidable under the DCL regardless of whether these other factors might be present.

In *Sharp*, the Second Circuit analyzed whether a creditor had adequately alleged lack of "fair consideration" in the context of DCL's constructive fraud provisions. 403 F.3d at 53. There, the court acknowledged that the "good faith" component of this inquiry is an "elusive concept," since the constructive fraud provisions of the statute expressly make the issue of intent irrelevant. *Sharp*, 403 F.3d at 54.

However, after examining a series of prior decisions under the DCL, *Sharp* made three conclusions relevant here: (1) a transferee's "good faith" is not lacking just because the creditor knows the debtor's repayment prefers him over other creditors; (2) this rule holds true whether or not the preferred creditor knows of the debtor's insolvency; and (3) the primary exception to this rule only comes into play if the creditor is an officer, director, or major shareholder of the debtor. *See Sharp*, 403 F.3d at 54.

---

[6] The law relies on shifting presumptions to streamline consideration of these matters. For instance, "when a transfer is made without fair consideration, a presumption of insolvency and fraudulent transfer arises, and the burden shifts to the transferee to rebut that presumption." *Battlefield Freedom Wash, LLC v. Song Yan Zhuo*, 51 N.Y.S.3d 527 (N.Y. App. Div. 2d Dep't 2017).

Even assuming *Sharp*'s trio of conclusions accurately[7] represents the decisional law of New York state, C.L. King has still plausibly alleged bad faith attributable to Riverside as transferee. First, the amended complaint alleges that Nicklin, despite knowing of his outstanding $13 million obligation to plaintiff, repaid the Riverside loan six months early as part of a scheme to hinder, delay, or defraud his creditors. *See, e.g.*, Am. Compl. ¶¶ 22, 24, 62-107.

Second, despite Salisbury's claims to the contrary, the amended complaint plausibly alleges that Riverside's acceptance of this repayment occurred in connection with a side agreement negotiated between Nicklin and Effron to keep the family's substantial business accounts at NSB Advisors. *See, e.g.*, *id*. ¶¶ 67-68, 70-82.

Third, C.L. King's factual allegations are sufficient to infer at this stage of the proceedings that Effron either knew about, or actually joined in on, Nicklin's fraudulent scheme to evade the $13 million obligation to plaintiff, drawing Riverside into the mess by virtue of his controlling authority as chairman of the board. *See* Am. Compl. ¶¶ 67-68, 70-82.

Alternatively, at this early stage C.L. King has also plausibly alleged that Riverside filled the role of "major shareholder" by extending substantial sums of money to fund the operations of NSB Advisors, an entity controlled exclusively by Nicklin. *See, e.g.*, Am. Compl. ¶¶ 49-54.

In sum, courts considering the issue of a transferee's "good faith" before and after *Sharp* was decided have repeatedly acknowledged that factual allegations like those set forth above state viable theories of recovery for constructive fraud, even when the transfer is made

---

[7] Salisbury seems to suggest that *Sharp* all but eliminates the possibility that a creditor could plead a transferee's bad faith where the transfer in question satisfies an existing debt. *See* Def.'s Mem. at 13.

in connection with the satisfaction of an otherwise valid antecedent debt.[8]  *See, e.g.*, *HBE Leasing Corp.*, 48 F.3d at 636 (requiring transferee to act "without either actual or constructive knowledge of any fraudulent scheme"); *Long Oil Heat, Inc.*, 375 F. Supp. at 198 ("As the court elaborated in *Sharp*, what matters is the transferee's knowledge of fraudulent conduct tainting the conveyance itself . . . ."); *In re Bernard L. Madoff Inv. Sec. LLC*, 2011 WL 3897970, at *11 (S.D.N.Y. Aug. 31, 2011) (distinguishing *Sharp* based on plausible allegations that the transferee knew of the fraud at the time of the transaction); *see also* 30 N.Y. JUR. 2D CREDITORS' RIGHTS § 389 ("A creditor of an insolvent debtor must stop at securing his or her debt, and if the creditor has knowledge of the debtor's fraudulent purpose in making the preference, such preference will be avoided in favor of other creditors.").  Accordingly, defendant's motion to dismiss these claims will be denied.

### 2. **Actual Fraud**

Salisbury also contends that C.L. King's claim for actual fraud under DCL § 276 must be dismissed because plaintiff has failed to allege Nicklin's fraudulent intent with sufficient particularity.  Def.'s Mem. at 15.  Plaintiff responds that it has alleged in detail a series of deliberate actions by Nicklin that clearly evince his intent to defraud creditors.

Under DCL § 276, "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors, is fraudulent as to both present and future creditors."  N.Y. DEBT. & CRED. LAW § 276.

---

[8] Salisbury's argument based on DCL § 278, which shields from liability a good faith purchaser for value, fails for substantially the same reasons.

"[T]o prove actual fraud under § 276, a creditor must show intent to defraud on the part of the transferor." *HBE Leasing Corp. v. Frank*, 61 F.3d 1054, 1059 n.5 (2d Cir. 1995) ("*HBE Leasing Corp. II*"). The burden of proving "actual intent" is on the party challenging the conveyance, who must plead it with the specificity, FED. R. CIV. P. 9(b), and prove it by "clear and convincing" evidence, *Long Oil Heat, Inc.*, 375 F. Supp. 3d at 195; *see also Sharp*, 403 F.3d at 56. "If actual fraud is established, the adequacy of consideration and the solvency of the transferor is immaterial." *Chen*, 8 F. Supp. 3d at 438.[9]

However, "[b]ecause direct proof of actual intent is rare, a plaintiff may rely on so-called 'badges of fraud' to prove his case, which are circumstances so commonly associated with fraudulent transfers that their presence gives rise to an inference of intent." *Long Oil Heat, Inc.*, 375 F. Supp. 3d at 195 (citation and internal quotation marks omitted).

> Courts have recognized the following nonexclusive list of badges of fraud:
>
> > (1) a close relationship between the parties to the transfer; (2) inadequacy of the consideration; (3) the transferor's knowledge of the creditor's claim and the transferor's inability to pay it; (4) the transferor's retention of control of the property after the transfer; (5) the fact that the transferred property was the only asset sufficient to pay the transferor's obligations; (6) the fact that the same attorney represented the transferee and transferor; and (7) a pattern or course of conduct by the transferor after it incurred its obligation to the creditor.

*Long Oil Heat, Inc.*, 375 F. Supp. 3d at 195.

Unbelievably, Salisbury contends that C.L. King's factual allegations fail to plausibly establish Nicklin's intent to defraud. This argument is rejected. To the contrary, plaintiff's

---

[9] The issue of intent is ordinarily a question of fact under New York law. *See, e.g., Long Oil Heat, Inc.*, 375 F. Supp. 3d at 195.

operative pleading contains a series of specific factual assertions that, assumed true for purposes of this motion, tend to establish that Nicklin's conduct was calculated to "hinder, delay, or defraud" plaintiff and other creditors. *See, e.g.*, Am. Compl. ¶¶ 22, 24, 63-107.

Further, as set forth in some detail above, C.L. King's factual allegations plausibly establish various badges of fraud. For instance, plaintiff alleges a suspiciously close, ongoing relationship between Effron/Riverside and Nicklin/NSB Advisors. Am. Compl. ¶¶ 29-31, 48-50. Plaintiff also alleges that the contested transfer occurred soon after Nicklin made Effron aware of his $13 million debt, and that the loan repayment occurred in apparent connection with, and close temporal proximity to, the execution of a revised investment agreement between Effron's business and Nicklin's firm. *Id*. ¶¶ 59, 62-68, 70-82. Finally, plaintiff alleges an overarching scheme by Nicklin to hide assets, beginning with his early repayment of the Riverside loan and culminating in a series of failed attempts to create revocable trusts nominally for the benefit of close family members. *Id*. ¶¶ 90-107.

In essence, a badge of fraud is any "questionable transfer not in the usual course of business." *Long Oil Heat, Inc.*, 375 F. Supp. 3d at 195 (quoting *Wall St. Assocs. v. Brodsky*, 684 N.Y.S.2d 244 (N.Y. App. Div. 1st Dep't 1999)). Under the circumstances presented by C.L. King's pleading, Nicklin's early repayment of a startup loan to a bank controlled by an important client at a time when $13 million was immediately due to another creditor certainly sounds questionable. Accordingly, Salisbury's motion to dismiss this claim will also be denied.

## V. **CONCLUSION**

Therefore, it is

ORDERED that

1. The stipulation and order (Dkt. No. 22) substituting chapter 7 trustee Daniel J. Ventricelli as plaintiff in this action is APPROVED;

2. The Clerk of the Court is directed to amend the caption to reflect that "Daniel J. Ventricelli, as Trustee of the Bankruptcy Estate of William F. Nicklin, Debtor" is now the named plaintiff in this action;

3. Salisbury's motion to dismiss is DENIED; and

4. Salisbury shall file and serve an answer to the amended complaint on or before October 13, 2019.

IT IS SO ORDERED.

Dated: September 23, 2019
Utica, New York.

United States District Judge